402492

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------X
ESTATE OF RAMARLEY GRAHAM, BY CONSTANCE
MALCOLM, ADMINISTRATRIX, PATRICIA HARTLEY,
CHINNOR CAMPBELL, A MINOR BY IS MOTHER
AND NATURAL GUARDIAN CONSTANCE MALCOLM,
FRANCLOT GRAHAM, AND CONSTANCE MALCOLM,

                              Plaintiffs,

2012-018623

**SUMMONS**
INDEX NO. 306731-13
PURCHASED 2/1/13

                    -against-

THE CITY OF NEW YORK, POLICE COMMISSIONER
RAYMOND KELLY, NYPD, DEPUTY INSPECTOR
PAUL DEENTREMONT, INDIVIDUALLY AND AS
A SUPERVISING POLICE OFFICER, P.O. RICHARD
HASTE, SHIELD # 20875, 47TH PCT.,
INDIVIDUALLY AND AS A
POLICE OFFICER, P.O. TYRONE HORNE,
SHIELD #24885 , INDIVIDUALLY AND AS A
POLICE OFFICER, SGT. SCOTT MORRIS,
SHIELD #953, INDIVIDUALLY AND AS AN OFFICER,
POLICE OFFICER ANDREW JARVIS, SHIELD #7776
INDIVIDUALLY AND AS A POLICE OFFICER,
POLICE OFFICER JANE DOE, IDENTITY PRESENTLY
UNKNOWN, 47TH PCT, SNEU UNIT, INDIVIDUALLY
AND AS A POLICE OFFICER, AND POLICE OFFICERS
JOHN DOES 1-10, IDENTITIES PRESENTLY UNKNOWN,
EACH INDIVIDUALLY AND AS A POLICE OFFICER,
                              Defendants.
-----------------------------------------------------------------X

Plaintiffs designate BRONX
County as the Place of trial
The basis of the venue is that
Bronx County is the Place
where the cause of action
arose.

**To the above named Defendant(s):**

   **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's Attorney with twenty (20) days after the service of this summons,

exclusive of the day of service (30) days after the service is complete if the summons is not

personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, New York
         January      , 2013

                                        EMDIN & RUSSELL, LLP.
                                        Attorneys for Plaintiffs
                                        499 Seventh Avenue 12N
                                        New York, New York 10018
                                        (212) 683-3995

**Defendant's address:**

City of New York
Office of the Corporation Counsel
Attorneys for City of New York
100 Church Street
4th floor
New York, New York 10007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
----------------------------------------------------------------X
ESTATE OF RAMARLEY GRAHAM, BY CONSTANCE
MALCOLM, ADMINISTRATRIX, PATRICIA HARTLEY,
CHINNOR CAMPBELL, A MINOR BY IS MOTHER
AND NATURAL GUARDIAN CONSTANCE MALCOLM,
FRANCLOT GRAHAM, AND CONSTANCE MALCOLM,

                                        Plaintiffs,


                        -against-


THE CITY OF NEW YORK, POLICE COMMISSIONER
RAYMOND KELLY, NYPD, DEPUTY INSPECTOR
PAUL DEENTREMONT, INDIVIDUALLY AND AS
A SUPERVISING POLICE OFFICER, P.O. RICHARD
HASTE, SHIELD #20875, 47TH PCT.,
INDIVIDUALLY AND AS A
POLICE OFFICER, P.O. TYRONE HORNE,
SHIELD #24885, INDIVIDUALLY AND AS A
POLICE OFFICER, SGT. SCOTT MORRIS,
SHIELD #953, INDIVIDUALLY AND AS AN OFFICER,
POLICE OFFICER ANDREW JARVIS, SHIELD # 7776,
INDIVIDUALLY AND AS A POLICE OFFICER,
POLICE OFFICER JANE DOE, IDENTITY PRESENTLY
UNKNOWN, 47TH PCT, SNEU UNIT, INDIVIDUALLY
AND AS A POLICE OFFICER, AND POLICE OFFICERS
JOHN DOES 1-10, IDENTITIES PRESENTLY UNKNOWN,
EACH INDIVIDUALLY AND AS A POLICE OFFICER,
                                        Defendants.
----------------------------------------------------------------X

VERIFIED COMPLAINT

The plaintiffs, The Estate of Ramarley Graham, by Constance Malcolm, Administratrix,

Constance Malcolm, Franclot Graham, Patricia Hartley, and Chinnor Campbell, a minor by his

mother and natural guardian Constance Malcolm, complaining of the defendants, by their

attorneys, Emdin & Russell, LLP., respectfully show to this Court and alleges:

## PARTIES

1.      Upon information and belief, at all times hereinafter mentioned, the defendant, the City of New York, hereinafter referred to as "City", was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and the public employer of all named defendants in this action.

2.      Upon information and belief that at all times hereinafter mentioned, the defendant "City" its agents, servants and employees operated, maintained and controlled the Police Department of the City of New York hereinafter referred to as "NYPD" including all police officers thereof.

3.      Upon information and belief the "NYPD" is an agency of the "City", existing and operating by virtue of the laws of the State of New York and the City of New York.

4.      Upon information and belief, at all relevant times hereunder Raymond Kelly, hereinafter referred to as "Kelly", was the Police Commissioner of the City of New York, appointed by and serving under the discretion of the Mayor of the City of New York, Michael Bloomberg.

5.      At all relevant times hereunder, Kelly was in charge of the New York City Police force, including all officers serving thereunder. He is sued in his individual capacity and in his capacity as a supervising police officer

6.      At all relevant times hereunder, including on February 2, 2012, Paul DeEntremont, hereinafter referred to as "DeEntremont", was the Deputy Inspector/Commanding Officer of the 47th pct., located in Bronx County, New York, and was in charges of all officers assigned to said command.

7.      Police Officer Richard Haste, hereinafter referred to as "Haste", at all relevant times

hereunder, including on February 2, 2012 was a police officer employed by the "City", and hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and/or "DeEntremont". He is sued in his individual capacity and in his capacity as a police officer.

8.     Upon information and belief, on February 2, 2012, "Haste" was assigned to the 47th pct. and was assigned to Street Narcotic Enforcement Unit, hereinafter referred to as "SNEU".

9.     Sergeant Scott Morris, hereinafter referred to as "Morris", at all relevant times hereunder, including on February 2, 2012 was a police officer employed by the "City", hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and/or "DeEntremont ". He is sued in his individual capacity and in his capacity as a police officer.

10.     Upon information and belief, on February 2, 2012, "Morris" was assigned to the 47th pct. and was assigned to Street Narcotic Enforcement Unit, hereinafter referred to as "SNEU".

11.     Police Officer Tyrone Horne, hereinafter referred to as "Horne", at all relevant times hereunder, including on February 2, 2012 was a police officer employed by the "City", and hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and/or "DeEntremont". He is sued in his individual capacity and in his capacity as a police officer.

12.     Upon information and belief, on February 2, 2012, "Horne" was assigned to the 47th pct. and was assigned to Street Narcotic Enforcement Unit, hereinafter referred to as "SNEU".

13.     Police Officer Andrew Jarvis, hereinafter referred to as "Jarvis", at all relevant times hereunder, including on February 2, 2012 was a police officer employed by the "City", and hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and/or "DeEntremont". He is sued in his individual capacity and in his capacity as a police officer.

14.     Upon information and belief, on February 2, 2012, "Jarvis" was assigned to the 47th pct.

and was assigned to Street Narcotic Enforcement Unit, hereinafter referred to as "SNEU".

15.    Upon information and belief Police Officer John Does 1-10, at all relevant times hereunder, including on February 2, 2012 were police officers employed by the "City" and hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and "DeEntremont". Each is sued in his/her individual capacity and in his/her capacity as a police officer. The identity, badge number and assignment of said John Doe police officers are presently unknown. Hereinafter the term "officers" shall refer to Haste, Morris, Jane Doe, Jarvis, Horne and John Does 1-10, collectively as a whole or in part.

16.    Upon information and belief Police Officer Jane Doe, at all relevant times hereunder, including on February 2, 2012 was a police officer employed by the "City", and hired, screened, trained, appointed, supervised, monitored and promoted by the "City", "Kelly", and "DeEntremont". She is sued in her individual capacity and in her capacity as a police officer. The identity, badge number and number of Jane Doe is presently unknown.

17.    Upon information and belief, on February 2, 2012, John Does 1-10 and Jane Doe were assigned to the 47th pct. Upon information and belief one or more of the officers were assigned to the "SNEU " team as set forth in this complaint.

18.    At all relevant times hereunder, Haste, Morris, Horne, Jarvis and the unidentified John and Jane Does were acting in the scope of their employment as New York City Police Officers.

19.    On February 2, 2012 Ramarley Graham, was 18 years of age, residing at 749 East 229th Street, in Bronx County. New York. He resided there with his mother Constance Malcolm, brother, Chinnor Campbell, sister, Leona Virgo, and grandmother, Patricia Hartley.

20.    On February 2, 2012, Constance Malcolm was the mother of Ramarley Graham and

Chinnor Campbell, and resided at 749 East 229th Street, Bronx, New York.

21.     On February 2, 2012, Chinnor Campbell, age 6, was the brother of Ramarley Graham and resided at 749 East 229th Street, Bronx, New York. Chinnor resided with Ramarley since his birth.

22.     On February 2, 2012, Patricia Hartley was the grandmother of Ramarley Graham and resided with him at 749 East 229th Street, Bronx, New York. Patricia Hartley continuously resided with Ramarley, since 1994.

23.     Franclot Graham is the father of Ramarley Graham. On February 2, 2012 he resided at 69 West 131st Street, New York, N.Y.

24.     749 East 229th Street is in the Wakefield Section of the Bronx and within the confines of the 47th pct.

25.     Ramarley Graham, Constance Malcolm, Chinnor Cambell, Patricia Hartley, and Franclot Graham are of Carribean descent.

26.     Prior to the commencement of this action, the plaintiff, Constance Malcolm, was appointed Administratrix of the Estate of Ramarley Graham, has been duly qualified to act as Adminisitratrix, and is now acting in said capacity.

## NOTICES OF CLAIM

27.     The Plaintiffs have filed a timely Notice of Claim against the City in compliance with General Municipal Law Section 50.

28.     The Estate of Ramarley Graham, hereinafter referred to as the "Estate", Constance Malcolm, hereinafter referred to as "Constance", Franclot Graham, and Patricia Hartley, hereinafter referred to as "Patsy", have each submitted to a 50 h hearing.

29.     Constance Malcolm submitted to a 50h hearing on behalf of her minor child, Chinnor

Campbell, hereinafter referred to as "Chinnor" was only 7 years of age and under doctor treatment for psychological trauma

30.    More than 30 days have elapsed since the service of said notices and the City has failed to pay or adjust the claim.

31.    This action is commenced within one year and ninety days after the cause of the initial action arose.

## GENERAL ALLEGATIONS

32.    Upon information and belief, on or before February 2, 2012 the City and Kelly, had instituted a highly aggressive "Stop and Frisk" program or policy that was carried out by its police officer employees, including the named defendant officers.

33.    In the decade since Kelly has been appointed Police Commissioner, the number of reported annual "street stops" rose from 97,000 in 2002 to 684,330 times in 2011. Upon information and belief said rise is due to the policies, directives and procedures implemented or approved by the "City" and/or "Kelly".

34.    Upon information and belief, as part of its Stop and Frisk Program, the City, Kelly, and the NYPD, provide multiple levels of training that covered Stop and Frisk procedures. That includes, but is not limited to, a workshop on Stop and Frisk, videos about the law of reasonable suspicion, patrol guidelines, Operational memorandum, and ongoing training after graduating from the Police Academy.

35.    Upon information and belief this program, hereinafter referred to as "Stop and Frisk", disproportionately targeted minorities, males and/or youths for stop, question and/or frisks, resulting in the excessive use of force disproportionately against minorities, and violated the

constitutional rights of citizens of New York City, including citizens residing within the confines of the 47th pct..

36.     In the matter of David Floyd et al. v City of New York et al. 283 FRD 153 , United States District Court, Southern District of New York, Justice Schiendlin, stated that "it is indisputable that the NYPD has an enormous stop and frisk program. There were 2.8 million "documented" stops between 2004 and 2009. These stops were made pursuant to a policy that is designed, implemented and monitored by the NYPD administration" (Order page 12).

37.     Of the reported 1,121,470 stop, question and frisks "reported" in 2008 and 2009 alone, 37%, or 416,350 were for individuals between the ages of 14 and 21 (according to the 2010 census this age range represents only 10% of the City population). Thus, we submit that the defendant's stop and frisk policy is heavily and disproportionately focused on youths of New York City, especially minority youths like Ramarly Graham.

38.     Statistical evidence further shows that pursuant to the NYPD stop and frisk policies and procedures, a great majority of civilians who were subjected to stop, question and/or frisk had not committed any crime, and that the NYPD engaged in said actions without reasonable suspicion of criminality. Furthermore statistics show that, and that blacks and latinos were disproportionately targeted for stops, summons, arrests and excessive use of force.

39.     Upon information and belief, it was statistically revealed that of the reported stops and frisks conducted by the NYPD between 2004 and 2009, officers "suspicions" of criminality was wrong nearly 9 out of 10 times.

40.     Upon information and belief, the City, NYPD, and/or Kelly were long aware of were aware of the racial disparity of police stop and frisks. In 2007 the NYPD commissioned a study through

The Rand Center on Quality Policing to study their stop, question and frisk patterns and practices. The study found that of the half a million persons stopped only 11% were caucasions, 53% black and 29% Hispanic. Moreover, of the people that were stopped, 45% of black and Hispanics that were stopped were frisked while only 29% of Caucasions that were stopped were frisked. Yet, when frisked, white suspects were 70% likelier than black suspects to have a weapon on them. (Rand study Analysis of racial Disparity in the New York Police Department Stop, Question and Frisk Practices, page xi)

41.    The Rand report found that black pedestrians were stopped at a rate 50 percent greater than their representation in the residential census. RAND report page xi. The RAND report made several recommendations to the NYPD to "improve interactions between police and pedestrians during stops and to improve the accuracy of the data collected during pedestrian stops" RAND page xv). Some of the many recommendations proposed include: review boroughs with the largest racial disparities in stop outcomes; record the reason(s) that the need to use force was used; monitor radio communications to make sure stop and frisk forms are being filled out; and identify, flag and investigate officers with out of the ordinary stop patterns. Finally, the report found "some correction in training during new officers' initial days on the street might be in order, particularly for any evaluation of Operation Impact practices" RAND page xvi

42.    Upon information and belief the defendants did not adopt these suggestions, and as of February 2, 2012, still continued to stop, frisk, search, and use force on minorities in a disproportionate manner, and target their stop and frisk policies in predominately non-white precincts within the City of New York.

43.    Upon information and belief, police officers routinely engage in "stops" and then attempt

to justify the stop and/or frisk, when in fact the basis for the stop or stop and frisk was pretextual and/or discriminatory in nature. Upon information and belief frisks and/or searches are conducted without justifiable reasons.

44.     According to a statistical analysis conducted by Columbia University Professor Jeffrey Fagan, submitted in the Floyd case, police cited (as a reason for a stop and frisk) a "suspicious bulge" in 10.4 % of all stops, yet a gun was found in .15 percent of all stops (or 1 out of every 69 person stopped on suspicion of concealing a weapon). Furtive movements were cited as a reason in more than 50% of all stops.

45.     Professor Fagan also statistically found that "NYPD stop and frisks are significantly more frequent for Black and Hispanic residents than they are for White residents, even when adjusting for local crime rates, racial composition of the local population........." Floyd at 29. He further statistically found that when stopped Blacks and Latinos are treated more harshly than Whites stopped on suspicion of similar criminal activity. The terms Black, White and Latinos are included within the NYPD reports and are adopted herein.

46.     Analyzed data of the Stop and Frisk Program revealed in a report released by the Center for Constitutional Rights in 2012 found:

- Analysis of the information recorded by police officers themselves in their stop and frisk reports indicates that more than 95,000 stops lacked reasonable, articulable suspicion and thus violated the Fourth Amendment.

- The NYPD continues to frequently and indiscriminately use the highly subjective and constitutionally questionable categories of "high crime area" and "furtive movements". "High crime area" is checked off in more than 60% of all stops. A comparison of actual crime rates to the claim that a stop was in a "high crime area" reveals that this factor was cited at roughly the same rate *regardless* of the crime rate. "Furtive movement" was also checked in a majority of stops, 53% of them. Here, too, there was no correlation between the frequency of this stated reason for a stop and actual crime rates. Both the

frequency of these classifications and their complete absence of any relationship to actual crime rates suggest strongly that they are not legitimate indicators or reasonable, articulable suspicion.

• Only 6% of stops result in arrest, an extraordinarily small number given that stops are legally supposed to be based on reasonable, articulable suspicion. The rates of seizure of weapons or contraband are miniscule – .12% of stops yield gun seizures and 1.8% contraband – and are lower than the seizure rates of random stops.

47.     Since 2009 the number of Stop and Frisks has dramatically risen. In 2010 there were a reported 601,055 stops.

48.     For the calendar year 2011, New York City precincts reported 685,724 "stops". Of that total number 350,743 were categorized as stops of persons of black descent, and 223,650 were of Latino descent (this does not include the number of individuals who were not categorized and who may be of black or Latino descent). Thus, 83.76% of individuals stopped were categorized as "minorities". Of the 381,704 persons frisked in 2011, 330,638 (89.2%) were black and latinos, and 27,341 (7.4%) were whites.

49.     According to a 2010 census "blacks" make up 25% of the City's population, "Latinos" 29% and "whites 33%.

50.     Statistical data also revealed that stop and frisk practices, when measured against the composition of the precinct population, was employed at a much greater frequency in precincts whose population was composed predominately of minorities. In 2011 the 73rd, 23, 81st, 41st and 25th pcts (Brownsville, East Harlem South, Bed Stuyvesant East, Hunts Point and East Harlem North) stopped 29.1%, 23.9%, 21.8%, 21.7% and 20.9% of their populations respectively. Meanwhile, in the Upper East Side (19th pct), Bensonhurst (62nd pct), Bay Ridge (68th pct.), Totennville (123rd pct.) and Borough Park (66th pct.), each predominately white precincts, residents were stopped at a rate of 2.5%, 2.4%, 2.3%, 2.1% and 2.0% of their populations. The

same pattern holds true when the stops resulted in frisks. The top 5 precincts reporting the most number of frisks were minority populated precincts, such as the 75th, 73rd, 44th, 115th and 40th, while the least amount of frisks were conducted in white populated precincts such as the 94th, 18th, 123rd, 17th and 22nd.

51.    Even in traditionally white neighborhoods, such as the 17th pct, (East Side, Manhattan), black and latino residents are stopped at a disproportionate rate when compared to its white citizens who reside within the same pct. To illustrate the point, in 2011, 71.4% of all stops made in Kipps Bay/Murray Hill, NY, were made against black and latinos. Yet, they account for only 7.8%. of the total precinct population. In Greenwich Village, where blacks and latinos comprise only 8% of the precinct, they accounted for 76.6 % of all stops. (New York Civil Liberties Union Stop and Frisk 2011 Report). The same reports also cites the additional precincts engaging in the same practice: 19th, 123rd, 1st, 61st, 111th, 20th, 13th and 62nd.

52.    It was further reported that at least one act of force was used in 148,079 "stops" (or in 21.5% of the total number of stops in 2011), with 76,483 reported the use of force against blacks, (21.8% of all stops of the 350,743 stops made against them in 2011). It should be noted that 51.7% of all "reported" instances of use of force by New York City Police were made against persons that the NYPD categorized as "black". In 2011 blacks and latinos had force used against them 129,590 times as compared to whites, 9,765 times.

53.    To illustrate the prevalence of the use of force within the context of the "Stop and Frisk" program, it should be noted that the number of stops in which at least one act of force was "reported" as being used (148,079 times) exceeded the total number of summons (41,215) and arrests (40,883) made from reported "stops" in New York City in 2011 (total 82,098). Thus, it was

1.8 more times more likely that force was used by police during a stop and frisk encounter than it was that said encounter resulted in an arrest or a summons being issued.

54.     Upon information and belief the City, Kelly and/or NYPD, either condoned the use of stop and frisk program, or the use of force in conjunction with it, as "means to an end", or acted with deliberate indifference to the knowledge that it was being utilized in that manner in a vast number of cases where there was no reasonable suspicion or no evidence of any criminality that would justify the use of any force, or force to the degree it was used, much less the initial stop or frisk.

55.     The City, and/or Kelly sought to justify the tremendous increase in the stop and frisk program by claiming that the program helped rid the City of guns. Yet, that contention or rationale is not statistically borne out. Nor would is serve as a justification to violate the laws of the United States Constitution or the State of New York. In 2003 the NYPD conducted 160,851 stops and recovered 604 guns. In 2011 the NYPD conducted 685,724 stops, or an additional 524,873 stops when measured against 2003 statistics. Yet they only recovered an extra 176 more guns as, or a total of 780. That computes to a .0003% success rate for the additional stops made.

56.     Upon information and belief, the City, and/or Kelly acted with deliberate indifference to: statistical evidence that enforcement or application of the "Stop and Frisk" program was highly unlikely to result in an arrest, a summons, or the recovery of weapons or contraband. (Weapons were recovered in 1.14% of the total number of stops reported in 2011).

57.     In fact, the City, and/or Kelly were deliberately indifferent to statistical evidence/reports/information/ complaints and other information that they possessed that indicated that: the stop and frisk program was targeting minorities, targeting minority communities or precincts; evidence that the stop and frisk program was racially biased; the program was targeting

youths; officers were using force, including unnecessary or excessive force in carrying out this program; the program was being unconstitutionally applied; the training police officers received was inadequate, and that there was a need for proper training in the academy, for supplemental training in service, and for in-field supervision and training in the laws of the 4th Amendment, the legal use of force, for reasonable suspicion and general police guidelines and search and seizure laws and parameters.

58.     Upon information and belief the City, and/or Kelly, acted with deliberate indifference that the aforementioned issues, would, could, and did, result in the countless violations of Constitutional rights of its citizenry.

59.     Upon information and belief, prior to February 2, 2012 the City, and/or Kelly failed to require that precinct commanders audit each officer worksheets, and failed to maintain or develop a system or methodology for identifying and tracking police officers who receive a baseline number of civilian complaints related to improper stops, improper frisks or searches, unnecessary or excessive use of force, threats, illegal entry into citizen's homes, and/or discourtesy.

60.     The stop and frisk program especially targeted minority youths, persons in the 14-24 age range.

61.     Although Black and Latino males between the ages of 14 and 24 account for only 4.7% of the City's population, they accounted for 41.6% of all stops in 2011. White youths in the same age group account for 2% of the City's population and were responsible for only 3.8% of the total number of stops. In 2011, young black men between the ages of 14 and 24 were "reported" being stopped 168,126 times, which exceeded the total number of young black men in this age range who reside in New York City (158,406).

62.     Minority youths were particularly vulnerable not only to stops, or stop and frisks, but more alarmingly to the use of force by the NYPD. As reported in Growing Up Police in the Age of Aggressive Police Policies, by Brett G Stoudt, Michelle Fine and Madeline Fox, in New York Law School Law Review, Volume 56 2011/2012, youths who were stopped during the two year period of 2008-2009 were frisked 61.3% of the time, they were arrested 5.4% of the time, issued summons 5.1% of the time, and weapons were found on the youths 1.2% of the time (most of the weapons recovered were knives, guns comprised only 17%. of the total weapons recovered). Yet, it was reported that force was used against the same youths 26.3% of the time, or approximately 2 ½ times more than the likelihood of being arrested or issued a summons. It was also found that reports of youths carrying a suspicious bulge or object, actions indicative of engaging in a violent crime, or an object in plain view 10.5%, 9.6%, and 1.7% respectively, were highly unreliable and unlikely to lead to the recovery of a gun. The total number reported (using the aforementioned criteria) of stop and frisks of youths were 90,756, yet the total guns recovered (under any basis or criteria for reasonable suspicion) was 831 during that period, or .009%.

63.     In all, 416,350 youths (381,578, or 91.6% were males and 218,260 of the total youths stopped (52.4%) were categorized as black or African American.) were stopped during 2008-2009 and 405,898 (97.5%) of them were free of weapons or contraband. Only 10% of the total youths stopped were white youths, and only 7% female from 2008-2009.

64.     Upon information and belief the "stop and frisk" program: targeted or was applied, in a discriminatory manner against minorities; was applied or enforced in predominately minority communities; was age biased against youths, age 14-21; and was gender biased (against males) as well. A profile that Ramarley Graham fit to a tee.

65.     These youths were also subjected to the unnecessary use of force. Stodt, Fine and Fox further reported that of the 109,499 times that force was used against youths in 2008 and 2009, the police, in 2142 instances, (more than twice the number of times that any weapon was recovered) drew their firearm and/or pointed their firearm at a suspect. In the other 107,357 cases where force was reportedly used, it included hands on suspect, placing the suspect on the ground or against a wall/car, the use of a baton or pepper spray among other things.

66.     The racial, gender and age disparity of these statistics could not, and should not, have been ignored.

67.     Upon information and belief the NYPD issued a Department Operations Order in 2002 prohibiting racial profiling. Nevertheless, upon information and belief, racial profiling continued to be utilized as a policing tool of the NYPD as of February 2, 2012. Moreover, there was no Operations Order or directive prohibiting any type of gender or age bias application of policing practices in place on that date.

68.     Police Commissioner Kelly has stated that the Stop and Frisk Program, and the "stops" thereunder, serve as a deterrent to criminal activity, which includes the criminal possession of a weapon. Therefore he endorsed, and upon information and belief, continues to endorse said program and have it applied by the police officers under his command, although said program was being used to stop and stop and frisk citizens without reasonable suspicion, and in a racially biased manner.

69.     Upon information and belief this Stop and Frisk program was in effect on February 2, 2012, and was trained, implemented and overseen throughout the City of New York and all precincts therein, including the 47th pct. by Deputy Inspector DeEntremont.

70.   While the aforementioned statistics were compiled for all New York City precincts, the statistics are particularly alarming for the 47th precinct, where the plaintiffs, with the exception of Franclot Graham, resided.

71.   At all relevant times hereunder the 47 pct., under the command of DeEntremont was a particularly aggressive precinct, participating in the Stop and Frisk Program.

72.   Upon information and belief 10,936 persons were reportedly "stopped" by police in the 47th pct. in 2011. Of that number, 10,276 were classified as minorities. The number of persons searched was 6640, or 60.72% of the total number persons who were stopped. A form of force was used 3,124 times, or in 28% of the total number of stops.

73.   There are 76 precincts in New York City, and in 2011 the 47th pct. ranked #26 in total number of stops, #24 in number of stops and frisks, #13 as a percentage of minority stop and frisks (96.8% were black and latino, yet black and latinos account for 88% of the precinct's population), #22 in total number of frisks, #18 in frisks as a percentage of total stops (60.7% of all stops), #15 in number of stops in which force was used, and #13 as a percentage where force was used in relation to total number of stops (28.6%)

74    The age bias application of the Stop and Frisk program is even more glaringly alarming for male blacks, like Ramarley Graham, between the ages of 14-21. Of the 10,936 people stopped in the 47th pct. in 2011, 5,089, or 46.5% were in that age group, and 3,952 (77.65% of people in the age group) were classified as black. Moreover, of the 3,952 persons that fell into this category, an incredible 93.04% were males.

75.   Thus, we submit, on February 2, 2012, the New York City Police Department, including, or especially including the 47th pct., had a practice, procedure, or policy that targeted minorities,

including "blacks" or "African Americans". That policy, custom or procedure also targeted youths between the ages of 14-21, and males, for stop, question and frisk without regard to reasonable suspicion.

76.     Of the 10,936 documented Stop, Question and Frisk reports that were filed from the 47th pct. in 2011 (that figure does not take into account the numerous individuals who were stopped, without any report being filed) only 919 (or 8.4%) of said stops resulted in an arrest, while 739 (6.76%) of said stops resulted in issuing a summons. Thus, 84.84% of the time persons stopped or stopped and frisked, were not issued a summons or arrested. The figures citywide are even higher, approximately 90%!

77.     Upon information and belief, and based on the aforementioned statistics, a high percentage of persons that were stopped, questioned and /or frisked in the 47th pct. were done so based upon their race, based upon the Stop and Frisk Program and/or due to the City, Kelly, and DeEntremont's deliberate indifference to the unconstitutional application of said program.

78.     Further statistical evidence from the 47th pct. for the year 2011, finds that of said 10, 936 documented "stops", police found contraband (narcotics) in only 264 cases and a weapon (not necessarily a gun) in 153 cases, which computes to 2.41% and 1.4% of the stops respectively.

79.     The most common reason used by the NYPD to justify stopping civilians of New York City, almost 90% of whom had committed no crime or violation, falls predominately within the category "furtive movements". In 2011 that reason was given in 51.3% of the total number of stops.

80.     However, upon information and belief, the City and/or Kelly either failed to train officers what constitutes "furtive movements", or acted with deliberate indifference to the need enhance or

supplement training in the area; they acted with deliberate indifference to the unequal application of stop and frisk procedures when "furtive movements" are committed by "whites", not resulting in "stops", while the same movements when committed by minorities resulted in "stops"; and they acted with deliberate indifference to the knowledge that "furtive movements" was not a statistically reliable marker of possession of contraband, a weapon, or that a person has committed, or is about to commit, a crime. In sum "furtive movements has been statistically proven to be unreliable to establish reasonable suspicion to justify a stop, or a stop, question and frisk.

81.    Of the many reasons provided as the predicate for said stops in the 47th pct., 1.74% was for carrying a suspicious object, 52.83% was for furtive movements, and 10.33% were for a "suspicious bulge".

82.    The aforementioned statistical proof shows that said reasons or rationale for said stops were inaccurate, unreliable, untrue, or without statistical probability of success.

83.    Yet, said program continued to be maintained and applied in 2012, citywide, and in the 47th pct., including on February 2, 2012.

84.    Further evidence of the defendants' overaggressive stop and frisk policies which targeted minority communities, such as the Wakefield section of the Bronx, can be found in the Trespass Affidavit Program, formerly known as the Operation Clean Halls. In Ligon v City of New York, No 12, Civ 2274, plaintiff brought an action alleging that the NYPD's trespass stops outside TAP building are often without reasonable suspicion, violating 4th Amendment rights. Justice Scheinldin in a written decision filed January 8, 2013, agreed.

85.    In her decision, Justice Scheindlin stated "while it may be difficult to say where, precisely, to draw the line between a constitutional and unconstitutional police encounter, such a line exists,

and the NYPD has systematically crossed it while making trespass stops outside TAP buildings in the Bronx". Ligon page 10.

86.     Although Bronx Assistant District Attorney Jeanette Rucker sent memos to NYPD Police Commanders and police officials expressing her concerns of the reasons police were providing for stopping innocent individuals outside Clean Hall Buildings, her concerns went unheeded.

87.     Dr Fagan concluded that 63% of "the recorded trespass stops outside the Clean Halls buildings in the Bronx in 2011, where no indoor behavior was observed were not based on any articulated reasonable suspicion" Ligon at 67

88.     Although Ramarley Graham's case does not involve a Clean Halls Building or fall within the TAP program, it does fall within the umbrella of the defendants' overaggressive policing policies directed at minorities and at minority communities, and their failure to adequately train and supervise its officers in the laws and parameters set by the 4th Amendment. The actions taken by the officers on February 2, 2012 as will be set forth herein, resulting in the death of Mr. Ramarley Graham and other constitutional violations, stems in large measure from, the policies, customs and procedures set by the defendants, including the stop and frisk program, the inadequate training and supervision of, and by its officers, and/or the pressures exerted by the City, NYPD DeEntremont and/or Kelly to meet performance standards measured by the number of arrests made and summons issued.

89.     Upon information and belief said Stop and Frisk program was established, maintained, supervised, continued, applied, and monitored to meet arrest/summons numbers/quotas and to establish and/or meet performance standards.

90.     Upon information and belief the NYPD, City and/or Kelly established performance

standards which demanded, or resulted in increased levels of stops and frisks.

91.    According to the 10/17/11 Police Officer Performance Objectives Operation Order, Commissioner Kelly directed all commands that "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals".

92.    Upon information and belief Deputy Inspector DeEntremont of the 47th pct. set the performance objectives that the named defendant officers were operating under on February 2, 2012.

93.    The same Operation Order stated "uniformed members.... Who do not demonstrate activities... or who fail to engage in proactive activities... will be evaluated accordingly and their assignments re-assessed".

94.    In the Floyd case, Justice Scheindlin cited evidence of a quota system which included a minimum number of monthly "stops". Said evidence includes:

   a.    the deposition of  Inspector Dwayne Montgomery, Commander of the 28th pct, who testified that he expected his officers to conduct a minimum of 2.3 stop and frisk per month and used that number "as a way of just gauging whether or not they were doing their job" Floyd at 20.

   b.    Police Officer Adhyl Polanco of the 41st pct testified that his commanding officers announced specific quotas for arrests and summons. He further testified that officers were threatened with reduced overtime or reassigned for failure to meet quotas.

   c.    Police Officer Adrian Schoolcraft recorded roll calls at the 81st pct where supervisors were yelling and instructing officers to conduct unlawful stop and arrests to meet

higher performance numbers. This order was coming down "the chain of command". These statements were made by Lieutenant Delafuents, Deputy Inspector Mauriello, and Sergeant Stukes and cites the instructions of Chief of Transportation Michael Scagnelli.

    d.    Police Officer Luis Pichardo of the 28th pct offered testimony that his supervisors imposed a five summons per tour quota.

95.    In a recent decision by Judge Shira Scheindlin, she ruled in a related case, Ligon v. The City of New York, that the NYPD has systematically crossed the line when making trespass stops outside TAP (trespass affidavit program) buildings in the Bronx.

96.    In reviewing the evidence in the Ligon case, Justice Scheinlin reached the conclusion that "the NYPD's inaccurate training has taught officers the following lesson: stop and question first, develop reasonable suspicion later".

97.    We submit, as set forth herein, that this same training and modus operundi was in effect and followed on the afternoon of February 2, 2012, leading to the tragic events inside Ramarley Graham's home as detailed below.

98.    Those events, on February 2, 2012, involved Haste, Morris, Jarvis, Horne, Jane Doe and other unknown members of the Street Narcotic Enforcement Unit Team, performed in the course of their duties as New York City Police Officers.

99.    Upon information and belief, On February 2, 2012, the SNEU team operating out of the 47th pct. was operating under the CITY, and /or Kelly's Stop and Frisk program, including but not limited to performance goals, arrests and summons quotas, and use of force directives, policies, procedures or practices.

100.    Officers assigned to SNEU were subject to a monthly/quarterly review and rating system

as per Interim Order #49 of the NYPD. Officers are "rated" and the purpose of such is to "identify and reward uniformed members of the service involved in the enforcement activity (which includes SNEU) by providing them with up to four career path points on an annual basis".

101.    Upon information and belief the number of summons issued and arrests made were part of the criteria used in the performance evaluation of SNEU officers. According to the Interim Order, "continued unsatisfactory performance will, absent mitigating circumstances, result in the imposition of sanctions by the Borough Personnel Review Board".

102.    Upon information and belief officers who issue a high number of summons, conduct a large number of "stop and frisks", and/or make or meet a minimum number of arrests, will receive a good performance rating, resulting in four career path points on an annual basis. Upon information and belief said points will ultimately be used or applied towards a "fast track" career path, for advancement.

103.    Upon information and belief, members of the SNEU unit, including the named defendant police officers, were eligible to receive up to 4 additional career path points by virtue of their assignment to said Unit. However, upon information and belief, in order to receive said points, the officer must "produce", i.e. be active and issue summons and make arrests.

104.    Upon information and belief in order to meet the activity quotas the SNEU team developed a system of 'next up". Upon information and belief the defendants engaged in a system or practice wherein officers would rotate arrests and who would catch them. That way all members of the "team" would meet their numbers, regardless of the training of the officer or his qualification and capability to be "next up" in the unfolding circumstances of the case. Upon information and belief the performance system and lack of any meaningful evaluation resulted in shortcuts taken by

NYPD officers, constitutional violations of citizens, false arrests, and illegal search and seizures. Yet, the City acted with deliberate indifference to the constitutional violations that their officers were engaged in, and the complaints of its residents, City of New York.

105    Upon information and belief Haste on or before February 2, 2012, volunteered to be assigned to the SNEU Unit at the 47th pct.

106.    Upon information and belief Morris volunteered to be assigned to the SNEU Unit at the 47th pct.

107.    Upon information and belief Jarvis volunteered to be assigned to the SNEU Unit at the 47th pct.

108.    Upon information and belief Horne volunteered to be assigned to the SNEU Unit at the 47th pct.

109.    Upon information and belief on February 2, 2012 at approximately 3:00 p.m., Haste was "next up".

110.    Upon information and belief Haste had not received his required training and was not qualified, ready, or prepared to be in the SNEU team, in the field or catch team of the SNEU team, or "next up" on February 2, 2012

111.    Upon information and belief DeEntremont, the Commanding Officer at the 47th pct. was, at all relevant times hereunder, responsible for the assignment, training and supervision of police officers assigned to the SNEU unit including defendant Haste, Morris, Horne, Jane Doe and/or Jarvis and other officers whose identities are presently unknown.

112.    Upon information and belief officers assigned to SNEU were required to attend and complete SNEU training which included SNEU and plainclothes training courses. They were also

required to be familiar with the contents of the SNEU Guidelines manual.

113.   The precinct Commander, DeEntremont, of the 47th pct. was required to ensure that police officers assigned to the 47th pct. SNEU , were in compliance with provisions of the Street Narcotics Enforcement Unit Guidelines Manual, Patrol Guidelines, Interim Orders and Administrative guidelines were enforced, including Stop and Frisk procedures. Upon information and belief he did not meet or enforce the required criteria as of February 2, 2012.

114.   Upon information and belief, on or before February 2, 2012, Haste did not receive the required SNEU training.

115.   Upon information and belief DeEntremont did not require Haste or other officers to complete the required training prior to actual SNEU field assignment.

116.   Upon information and belief, at all relevant times hereunder the City, and/or Kelly was in charge of all testing for recruits and analysis of testing, hiring, training, assignment, in service training, monitoring, supervision and disciplining NYPD officers, including the named defendants herein. Upon information and belief said training consists of, but is not limited to firearm training, probable cause and reasonable suspicion training, search and seizure training, warrant training, review of legal bulletins and interim orders, and SNEU training if applicable. Upon information and belief part of the firearm training is to, in all circumstances, aim for and shoot center mass when firing a weapon.

117.   Upon information and belief the policy to shoot for and aim center mass has caused unnecessary deaths when less lethal alternatives were available, but not explored due to NYPD policy and procedures.

118.   In early January, 2007, Kelly asked the RAND corporation to undertake an "objective,

comprehensive assessment of the NYPD firearm training and firearm discharge review process".
The result was a 114 page report titled Evaluation of the New York City Police Department
Firearm Training and Firearm-Discharge review Process, by Rostker, Hanser, Hix, Jensen, Morral,
Ridgeway and Schell., published in 2008

119.   Among the many findings that the RAND Corporation made were:

   a.      Each recruit/student generally gets no more than one chance at each hands-on and
skills simulations with instructors. Therefore the recruits "do not have an opportunity to practice
what they have been taught" Executive Summary page xvii.

   b.      Students are not graded

   c.      Students are not called on to demonstrate that they have mastered the techniques
being taught

   d.      Even when the recruit's file is marked retrained, it did not mean that the recruit was
given an opportunity to try the simulation again.

120.    The RAND reports concluded " it is not possible for the department to know whether the
students mastered the information taught in the classroom, whether they are able to apply it in the
scenarios or on the job, or whether the two hours of classroom time was effective in achieving the
training performance objectives. The failure to ensure that students have internalized the right way
to approach situations by providing sufficient opportunities to practice what they have been taught
may create an inappropriate response on the street and is a shortcoming in the NYPD
recruit-training program"  RAND report executive summary page xvii.

121.    Upon information and belief Haste was hired in 2008 and trained in the manner in which
the RAND corporation found to be a "shortcoming" and "may lead to inappropriate responses on

the street".

122.    On February 2, 2012, Haste, Morris, Jane Doe, Horne, Jarvis and others committed an inappropriate response to their encounter with Ramarley Graham due to the City, and/or Kelly's deliberate indifference to the need to adequately train, retrain and prepare its officers in the use, and discharge of their weapons. They further acted with deliberate indifference to the fact that their policy to shoot center mass, would result in the death of innocent persons.

123.    The RAND report made some findings and recommendations for in-service (for NYPD officers once out of the academy) training as well.

124.    RAND found that "in service training is particularly important to reinforce the comprehensive training that officers receive as recruits, to correct bad habits developed on the job, and to keep up with the dynamically changing law-enforcement environment." Page xviii. However, they found that "unfortunately, officers are generally not tested to see whether the training was absorbed." xviii

125.    The RAND report further found that firearm requalification course which involves shooting at paper targets on a known distance range, does not demonstrate that the officer has mastered his weapon or is ready for a street encounter.

126.    The report recommended that "recruits should be required to pass proficiency standards in real-life scenario based tests of complex decision making before they graduate from the police academy. Seasoned officers should be required to demonstrate their continued proficiency on the most demanding real life scenarios, just as, for example seasoned airline pilots are required to do." Page xviii

127.    Upon information and belief the NYPD, City and/or Kelly did not adopt these

recommendations and neither Haste, nor Morris or Jane Doe were required to demonstrate their "continued proficiency" on or before February 2, 2012.

128.   Upon information and belief the training, or lack thereof, that the defendant officers received on or before February 2, 2012 caused or contributed to the chain of events culminating in Ramarley Graham's death that day.

129.   Upon information and belief the City, Kelly and the NYPD were aware of their need to update and improve their training in the academy as well as in-service, their need to provide more training and supervision for "street encounters", and the need to test, and retest officers proficiency in tactics, guidelines and the law, yet they, with deliberate indifference, failed to do so, and as a consequence the plaintiffs were injured or harmed.

130.   RAND made 13 recommendations to the NYPD, (pages xviii-xix) to facilitate training effectiveness. Upon information and belief, many, if not all of the recommendations were not adopted.

131.   Upon information and belief, under NYPD guidelines a police officer shall not use deadly force against another person unless the officer has probable cause to believe that he or she must protect himself or another person present from imminent death or serious physical injury.

132.   The NYPD guidelines further admonish that an officer shall not discharge his weapon if it poses an unnecessary danger to other persons. The guidelines require that an officer shall not fire his weapon to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present. These guidelines were not followed on February 2 2012.

133.   The Rand report noted that when examining the propriety of a shooting, the NYPD Firearm

discharge investigation should focus not only on the shooting, but should focus on the events and choices made leading up to the shooting, a path suggested in the NYPD Police Academy Student's Guide 2007a. Analyzing shooting in this manner, shootings may make discharging a weapon unnecessary or less likely to occur.

134.    However, upon information and belief the NYPD Firearm Review process does not adopt the focus suggested in the RAND report and the Police Academy Student Guide. Consequently firearm training and tactics, the implementation thereof, and the investigation and review of the use of deadly force, do not stress or enforce the need to avoid placing an officer in a position where he/she feels the need to use deadly force.

135.    At the Police Academy, Police Officers are taught that "if they are involved in a shooting, they will be judged no only on the propriety of the discharge but also on the tactics they used prior to the shooting, including whether they unnecessarily placed themselves in a position that gave them no choice but to fire their weapons", RAND report page 44, quoting NYPD Police Academy 2007a, p 20. Yet, in the field, this training, or "judgment" is not enforced or applied, lending tacit approval to an approach where officers do not feel a need to justify their actions regarding the events leading up to their use of deadly force.

136.    Said focus allows a police officer to justify his shooting based upon "I thought he had a weapon", instead of focusing on the propriety or reasonableness of the officer's actions prior to discharge of the weapon, and whether said actions are consistent or logical with the officers conduct and justification for discharging his weapon.

137.    The RAND report commissioned by Kelly, recommended that the Firearm Discharge Review Board conduct a broad inquiry into police shootings. Some of the inquiry would focus on:

Did the officers approach the situation cautiously, and in a manner consistent with her training?

Did the officers take advantage of all reasonable available assistance, information, and tactical considerations, (i.e. cover) before confronting the individual they shot

Did the officers avoid an unnecessary confrontation with the person that they shot?

Was the officer's reaction at the time of the shooting reasonable, or is there evidence that the shooting was the result of panic or carelessness? (RAND report page 44)

138.    The deliberate indifference of the NYPD on or before February 2, 2012, to train, follow, adopt, enforce and/or discipline officers who fail to follow Police Academy Student Guidelines regarding the use of deadly force, has lead to grossly irresponsible police tactics, including but not limited to the failure to wait for more trained, seasoned, and/or qualified officers to arrive to a scene where deadly force was eventually employed, and a failure to deescalate or defuse potentially volatile situations without the use of deadly force, often resulting in the unnecessary and/or unreasonable use of deadly force, including the deadly force used on Ramarley Graham. It has also lead to few if any disciplinary actions for firing a weapon in the course of duty. Officers know that by saying that they "believed the victim of the shooting was armed, or reaching for something....." will insulate them from potential disciplinary action from the NYPD.

## THE EVENTS OF FEBRUARY 2, 2012, AND ITS AFTERMATH

139.    Upon information and belief, Morris, Haste, Horne, Jarvis, Jane Doe and an unknown number of John and Jane Does were working in the SNEU of the 47th pct., and were stationed in the vicinity of East 229th Street, Bronx County, New York between the approximate hours of 2:30 and 3:30 p.m. on February 2, 2012

140.     Upon information and belief Horne and Jarvis were part of the SNEU observation team on February 2, 2012.

141.     Upon information and belief Haste, Morris, and Jane Doe were part of the "back-up" or "catch team" of the SNEU operation on February 2, 2012 in the vicinity of East 229th Street in the Bronx.

142.     Upon information and belief of February 2, 2012 Morris was Haste's, Horne's, Jane Doe's, and Jarvis' supervisor for that days assignment.

143.     Upon information and belief other officer participated in this assignment, however their identities are presently unknown.

144.     On February 2, 2012 at approximately 3:00 p.m., Ramarley Graham, hereinafter referred to as Ramarley, was returning to his home located at 749 East 229th Street, Bronx, New York.

145      749 East 229th Street is a three family free standing building, and Ramarley's home was on the second floor thereat.

146.     Ramarley entered the building and ascended the stairs to the second floor, the front door locking behind him.

147.     Ramarley entered his apartment, with the front door of the apartment locking behind him.

148.     Inside the apartment was his brother, Chinnor, and grandmother, "Patsy".

149.     Shortly after Ramarley entered the building and ascended the stairs, numerous police officers, with guns drawn, ran up to the front door of 749 East 229th Street, and forcibly attempted to gain entrance. Among said officers were, upon information and belief, Haste and Morris.

150.     The officers were not in possession of a search or an arrest warrant.

151.     Ramarley Graham had not committed any crime.

152.    Nevertheless, the officers, unable to gain access through the front door, surrounded the house, and eventually several officers obtained access to the building at gunpoint and through the backdoor of the first floor tenants' home.

153.    Once they gained access, the officers, identities unknown, opened the front door to provide access to additional officers. Approximately four plus minutes had passed since Ramarley had entered the premises. At no time did the police receive any call or signal for help or distress.

154.    Upon information and belief the police slammed into the Ramarley's apartment door, startling Patsy.

155.    Both Patsy and Ramarley went into the apartment hallway. Chinnor was in close proximity behind them. Haste burst into the apartment with his gun drawn. Upon information and belief Jane Doe and Morris were behind him.

156.    Neither Patsy, nor Chinnor, heard the police identify themselves either before or after they entered the apartment. No one gave the officers permission to enter the premises

157.    The officers failed to identify themselves inside the apartment, announce their purpose inside the apartment, and they failed to issue any warnings inside the apartment.

158.    Haste ran down the hallway with his gun pointed and ready to fire. Both Ramarley and Patsy were in the hallway at the time.

159.    Ramarley went inside the hallway bathroom.

160.    Haste ran to the bathroom and immediately fired a shot into the bathroom, striking Ramarley in the chest, and dropping him to the ground.

161.    Patsy was several feet away when the shot was fired.

162.    Ramarley was unarmed.

163.   Upon information and belief, Police later claimed that they recovered a small amount of marijuana from the bathroom toilet.

164.   Patsy immediately cried out "why did you shoot him, why you killed him?", and she was pushed backward by Haste into a vase and warned to "get the fuck away before I have to shoot you too".

165.   Patsy told Chinnor to get the phone. After Chinnor gave her the phone, a Jane Doe police office, attempted to grab it from her, after a male officer ordered Jane Doe not to allow Patsy to get to the phone to call anyone. Jane Doe grabbed the phone from her, but Patsy got it back and attempted to make a call. A male officer, upon information and belief Morris, grabbed Patsy from behind and took her arm and twisted it behind her back and removed the phone. She was grabbed by the neck, pushed down into a chair. The officer cursed at Patsy and threatened to handcuff her. Upon information and belief, Patsy was held down in the chair by her shoulders and told to sit. She was told that if she moved, she would be handcuffed.

166.   Patsy was age 58 and weighed 85 pounds at the time.

167.   Pasty could see Ramarley's legs moving and trembling, however she was prevented from going to her grandson by the officers who pushed her back.

168.   Numerous additional officers entered the apartment.

169.   The aforementioned conduct and actions were witnessed by Chinnor.

170.   Police officers removed Chinnor and his grandmother, Patsy, from the apartment, separating them. Pasty was eventually ordered to go inside a police car and she was transported from the location to the 47th pct.

171.   Constance Malcolm arrived on the scene at approximately 3:30 p.m.. The area had been

taped off and she was prevented from going near her home. No information was provided to her by the numerous police officers present at that time. She was not able to see either of her sons or her mother.

172.   An officer transported Constance to the 47th pct. and she arrived there at approximately 3:40 p.m.. Again, no information was initially provided to her, and she was unaware what, if anything, happened at her home.

173   Constance only learned that a tragedy happened at her home when an officer was overheard saying that he was coming from "the homicide".  This was overheard at the same time police officers were bringing Patsy upstairs. When Patsy saw her daughter she told Constance "they killed Marley".

174.   Unknown police officers physically removed Patsy from the area, separating her from Constance. They placed Patsy in a locked room. Constance went from room to room trying to find her mother, screaming, crying, and banging on several doors. Eventually a police officer opened a door, and seeing her mother inside, Constance reached for her and grabbed Patsy to pull her outside the room.

175.   A police officer grabbed Patsy and pulled her back inside the room and closed and locked the door. Another officer came out of the room and grabbed Constance by her arms and pulled them back behind her, restraining her from her mother, and causing her to fall to the floor.

176.   Constance was crying and screaming to "let me go" but no one came to her assistance.

177.   Police officers at the precinct did not provide any information to Constance, including the location of Ramarley or her son Chinnor.

178.   Ramarley was pronounced dead at 3:53 p.m., while Constance was at the 47th precinct.

179.   Franclot Graham arrived at the precinct, and when he too was not provided any information from police officer(s), he and Connie left the precinct to go back to the scene of the occurrence in an attempt to learn what happened and to find Chinnor.

180.   Meanwhile, Patsy was kept in a locked room inside the precinct for almost seven hours. The police ignored her requests to leave and to see her daughter. When her attorney appeared at the precinct to see her, he too was denied access to her for over 90 minutes.

181.   Police officers aggressively interrogated Patsy. They called her a fucking liar and even stuck their fingers in her cup of water and flicked their wet fingers on the walls to demonstrate how blood splatters. They falsely claimed that Ramarley threw a gun out the window and that she was trying to cover up for him.

182.   The officers attempted to get Patsy to say things which were not true. They showed Patsy a picture of another individual, who upon information and belief, was shot. They claimed that it was Ramarley.

183.   Patsy was not allowed to leave the precinct to almost 10:00 p.m..

184.   After Patsy was released she went to a hospital and was treated for trauma.

185.   When Constance and Franclot arrived back at 749 East 229th Street they could not get into Connie's house or determine the whereabouts of her son, Chinnor. Eventually, a Captain brought Chinnor to Connie.

186.   Connie, Patsy and Chinnor were not allowed access to their home for over 48 hours.

187.   Upon information and belief the police searched the interior and exterior to 749 East 229th Street for 2 days and did not recover any weapon.

188.   An unarmed Ramarley Graham was shot and killed in his own home by Police Officer

Richard Haste, while he was acting within the scope of his employment for the City and/or NYPD.

189.   It is clear that on February 2, 2012 the SNEU team members of the 47th pct., including the named defendant police officers herein, were operating under Stop and Frisk guidelines, procedures, directives and/or training that was established, implemented, enforced and/or overseen by defendants City, and/or Kelly, . Upon information and belief it was their (the officers of SNEU) intent to stop, question and/or frisk Ramarley Graham before he entered his home. Upon information and belief the officers conduct toward Ramarley Graham on February 2, 2012, was not based on reasonable suspicion but was due to insufficient and/or ineffective training and/or supervision, and/or the need to meet arrest/summons quotas, and/or the need to meet minimum "performance standards of arrest activity". Upon information and belief the officers conduct also was the result of racial profiling, gender and age profiling and discriminatory application of the law including search and seizure and stop and frisk.

190.   Upon information and belief, the defendants attempted to cover-up their misconduct.

191.   After the shooting the police issued a statement through police spokesman Paul Browne, that Plainclothes officers wearing NYPD jackets were investigating street corner drug dealing. The suspect, Ramarley Graham took off on foot and rounded a corner toward his home, and an officer pursued him into the second floor apartment. Browne described the officers as having "pursued" Graham to his home, and upon entry the "officer struggled with Mr. Graham near the bathroom, before shooting him". The statements from Browne quoted by Matt Flegenheimer and Al Baker of the New York Times on February 2, 2012, further stated that "it was unclear whether the gun, a 9 millimeter semiautomatic was fired during the struggle or if the men had been separated when the shooting occurred".

192.    Sean Gardiner, of the Wall Street Journal, on February 5, 2012, reported Paul Browne as offering this version of the events inside Ramarley Graham's home…. "Mr. Graham rushed into a second floor bathroom, where he was possibly trying to flush drugs. Mr. Graham spun around when an officer confronted him, and the officer shot him once in the chest after what, Mr. Browne said, was a struggle."

193.    The same article quoting a law enforcement official, upon information and belief Browne stated that Graham had 8 prior arrests, although most of the arrests were dismissed, and /or sealed and should not have been available to law enforcement personnel, or for public distribution. In fact, the very accuracy of the statement is in question.

194.    Said statements from Browne were, upon information and belief, provided to him by one or more officers at the scene of the incident, or obtained through a review of statements that officers provided in the aftermath of the incident. They were false and made with the intent to conspire to cover-up the true facts of the incident in order to justify or to provide reasonable justification for the shooting. They were made with the intent to sway public opinion and sympathy against Ramarley Graham and his family and in favor of the police and with intent to interfere with due process of law and/or access to the Courts.

195.    Upon information and belief the only way that Graham's arrest history could be accessed would be through the illegal and/or improper retention of sealed information, and unauthorized access and release of said information by police personnel. Said concerns were made known to Police Commissioner Kelly, but upon information and belief he has not commenced an investigation into said violation.

196.    Police Commissioner Kelly also issued false and misleading statements relating to the facts

and circumstances leading up to the shooting. Kelly was quoted (Wall Street Journal 2/5/12) as saying officers observed the butt of a gun peeking out of Graham's pants when he emerged from a nearby house. Kelly stated "the officers ......identified themselves and ordered Graham not to move, but the teenager dashed into his home on East 229th Street". "When no one answered calls to open up, they broke down the door". Kelly further stated that, according to an officer present, (upon information and belief Jane Doe or Sgt. Morris), Haste yelled "show me your hands, show me your hands" and "gun, gun" before firing his weapon.

197    The aforementioned statements made by Kelly and Browne were false.

198.    Kelly later partially retracted the story promoted through his and Browne's prior statements. He admitted on February 5, 2012 that there had been no struggle inside the apartment prior to the firing of the shot. He has offered no explanation, nor, upon information and belief conducted an investigation into the origin of said false information.

199.    In yet another article, cbslocal.com, dated February 4, 2012 it states that according to the "police" Graham was acting suspiciously on the street, and that when he sees the cops, he runs. Again, said statements are entirely false.

200.    Additional details of the shooting were slowly released by the police. The New York Times, in an article written by Joseph Goldstein dated February 22, 2012, reported that SNEU team members observed Graham moving his hands in a certain way that lead them to believe that he was armed.

201.    In the same article Commissioner Kelly was quoted as stating that "on the afternoon of February 2, 2012 the Unit's observation team set up opposite a bodega near White Plains Road and East 228th Street in the Bronx. Kelly went on to say that the observation team observed Graham

and two friends emerge from the store and walk north. The observation team, who were in a car, followed them and radioed their suspicion to the back-up team that Graham may be armed. According to Kelly, they made a second transmission (on a narrow tactical frequency) that they observed the butt of a gun in Graham's waistband.

202.    Upon information and belief the NYPD have a video of Ramarley Graham and two friends walking on White Plains Rd. No gun is visible in his waistband. He was not in possession of a weapon.

203.    It is unknown, what, if any, "observations" were in fact made that day, or what the contents of the transmissions, if any, were at the time. What is known, however, is that if they claimed Ramarley possessed a gun, they were terribly wrong and without basis.   Ramarley Graham was not armed with a gun or anything.

204.    Upon information and belief it is usual police practice upon seeing a suspect with a gun to call for back-up on a wide band frequency that would be picked up by the officers from that precinct and neighboring precincts. However, upon information and belief, neither the observation officers from the SNEU team, nor the "apprehension team" officers called for back up on a wide band transmission, which would be recorded and memorialized, and would summon back up from other units to the scene. Moreover, the defendants failed to call for, or wait for, a specialized police team trained to take down doors and clear rooms, before forcibly breaking down the door to Ramarley's home and entering at gunpoint.

205.    The SNEU team failed to secure a warrant when they had the house surrounded and there was no means of "escape" for the "suspect", i.e. Ramarley Graham.

206.    The SNEU team, including Haste, Morris and/or Jane Doe, who, upon information and

belief were not dressed in required regulation uniform, did not have exigent circumstances to knock down the front door to the home occupied at the time by Ramarley, Patsy and Chinnor.

207.   Ramarley Graham had not committed any crime. A video of the deceased does not reflect that he was acting suspiciously. Contrary to the police assertions otherwise, it shows that Ramarley Graham was not running from the police. In fact it shows Graham casually walking up to his front door, opening it and closing it behind him. Upon information and belief the police "pursuit", if any, was unknown to Ramarley. It was interrupted by almost four minute period while police officers, including the defendants, using guns, threats and force entered the building through a neighbor's apartment and kicked in Ramarley's front door.

208.   The police officers did not have probable cause to break down the door to, and enter Constance, Ramarley, Chinnor and Patsy's home on February 2, 2012.

209.   At no time during the events described herein, or as the events occurred, did Haste have probable cause to discharge his firearm. He never was in imminent danger of any harm.

210.   Upon information and belief the defendant police officers did not have the proper training to conduct SNEU related activities on or before February 2, 2012, causing or contributing to Ramarley Graham's death and illegal entry into the home and the actions inside the home.

211.   Upon information and belief the defendant police officers violated SNEU guidelines on February 2, 2012, causing or contributing to Ramarley Graham's death and illegal entry into the home and the actions inside the home.

212.   Upon information and belief, on February 2, 2012, Haste was not wearing his regulation uniform as required when he entered 749 East 229th Street, Bronx, New York.

213.   Upon information and belief other team members of SNEU, on February 2, 2012, were

working in plain clothes in violation of SNEU guidelines.

214.    The police department later admitted that Haste did not have SNEU training or plainclothes training before his assignment to SNEU. Kelly later ordered a citywide audit of all SNEU teams.

215.    Upon information and belief it was a common practice of the NYPD, and precinct commanders and supervisors to assign officers to plain clothes teams and SNEU teams before they receive proper and required training. Upon information and belief the required SNEU training includes, but is not limited to how to recognize drugs and hand to hand transactions, and search and seizure law. Upon information and belief the training takes about a week.

216.    Upon information and belief it was common practice of the NYPD to permit officers to participate in the SNEU team arrests for months without receiving required training.

217.    Upon information and belief, the City, Kelly and DeEntremont acted with deliberate indifference to the fact that officers did not receive their required training, were unfamiliar with SNEU guidelines, were not properly numbered, dressed or supervised, and the likelihood that their inexperience and unpreparedness would result in the constitutional violations which occurred on February 2, 2012.

218.    Upon information and belief Haste, Morris, Doe and other members of the SNEU team were operating under an arrest or summons quota system or performance requirement on February 2, 2012. The defendants acted with deliberate indifference that this quota system or policy would result in constitutional violations of citizens of New York City. It did result in the constitutional violations of the plaintiffs herein, including the death of Ramarley Graham, the assault of Patsy and the extreme emotional distress of Patsy and Chinnor who were in the zone of danger when the shot was fired.

219.   James Gill, the medical examiner, listed the cause of Ramarley Graham's death as a gunshot wound of chest with perforation of the aorta and lung. Cause of death **HOMOCIDE.** The time of shooting 3:01 p.m.. The time of death 3:53 p.m.

220.   Is is hereby alleged pursuant to CPLR 1603, that the hereinafter causes of action are exempt from operation of CPLR 1601, by reason of one or more of the exemptions provided by CPLR 1602.

## DAMAGES

221.   As a direct and proximate result of the said acts of the defendants, Ramarley Graham suffered the following damages:

    a.   Violation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the Constitution.

    b.   Loss of life and liberty

    c.   Discrimination based on race, gender and/or age

    d.   Pre death conscience pain and suffering

    e.   Emotional and psychological distress and horror

    e.   Loss of enjoyment of life

    f.   The right to be secure in his person and free from the use of unreasonable force

    g.   The right to due process of law

222.   As a direct and proximate result of the said acts of the defendants, Patricia Hartley suffered the following damages:

    a.   Violation of her rights under the First, Fourth, and Fourteenth Amendments to the Constitution.

    b.    Loss of physical liberty

    c.    Physical and emotional trauma

    d.    Pain and suffering

    e.    Extreme emotional distress

223.    As a direct and proximate result of the said acts of the defendants, Chinnor Campbell suffered the following damages:

    a.    Violation of his rights under the First, Fourth, and Fourteenth Amendments to the Constitution.

    b.    Loss of privacy

    c.    Physical and emotional trauma

    d.    Pain and suffering

    e.    Extreme emotional distress

224.    As a direct and proximate result of the said acts of the defendants, Constance Malcolm suffered the following damages:

    a.    Physical and emotional trauma

    b.    Pain and suffering

    c.    Extreme emotional distress

    d.    Loss of Enjoyment of Life

    e.    Economic Damages including loss of income and support

    f.    Humiliation and embarrassment

    g.    Loss of love, nurture, care, services, affection and companionship

225.    As a direct and proximate result of the said acts of the defendants, Franclot Graham

suffered the following damages:

    a.    Loss of Enjoyment of Life

    b.    Economic Damages including loss of support

    c.    Loss of love, nurture, care, services, affection and companionship

    d.    Humiliation and embarrassment

### AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF CONSTANCE MALCOLM, AS ADMINISTRATRIX OF THE ESTATE OF RAMARLEY GRAHAM FOR WRONGFUL DEATH

226.    The plaintiff, "Estate" repeats and realleges each and every allegation set forth above numbered "1" through "225"  inclusive with the same force and effect as if more fully set forth at length herein.

227.    That on February 2, 2012, defendant Haste, acting in the scope of his employment as a New York City Police Officer, aimed at, shot at and killed the decedent Ramarley Graham inside the decedent's home.

228.    The shooting was without probable cause.

229.    The decedent was unarmed.

230.    The decedent had not committed a felony

231.    The decedent had not committed a crime.

232.    The decedent was lawfully in his home.

233.    Haste, Morris and/or Jane Doe, while acting in their official capacities as New York City Police Officers and in the scope of their employment for the "City" and "NYPD", forcibly entered the home without a warrant and without permission or an invitation to enter.

234.    The shooting of Ramarley Graham was performed knowingly, intentionally and willfully.

235.    The shooting was performed recklessly and in a manner that evinced a gross disregard to human life.

236.    The shooting was performed without reason or provocation.

237.    The aforementioned shooting resulted in the death of Ramarley Graham.

238.    Ramarley Graham was survived by his parents, Constance Malcolm and Franclot Graham.

239.    Constance Malcolm and Franclot Graham suffered a pecuniary loss, and a loss of assistance, a loss of future support and assistance and a loss of household services by reason of the death of their son, Ramarley.

240.    That by reason of the aforesaid, Constance Malcolm, administratrix of the Estate of Ramarley Graham, demands judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.

### AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF CONSTANCE MALCOLM, AS ADMINISTRATRIX OF THE ESTATE OF RAMARLEY GRAHAM FOR ASSAULT AND BATTERY AND CONSCIENCE PAIN AND SUFFERING

241.    The plaintiffs repeat and realleges each and every allegation set forth above numbered "1" through "240" inclusive with the same force and effect as if more fully set forth at length herein.

242.    Ramarley was assaulted and battered when he was shot at approximately 3:01 p.m., on February 2, 2012, by Police Officer Haste.

243.    The shooting was performed knowingly, intentionally and willingly.

244.    The shooting was without probable cause.

245.    Haste was acting within the scope of his employment, with the defendants "City" and

"NYPD".

246.   The shooting was performed in the presence of, and under the supervision of, Haste's supervisor, Morris, who failed to intervene or follow proper procedure.

247.   Morris, allowed Haste to forcibly enter the subject premises with his gun drawn and loaded, without probable cause, and without a warrant.

248.   Morris was working within the scope of his employment with the defendants "City" and "NYPD".

249.   Ramarley's grandmother, Patsy, witnessed Ramarley move his limbs before she was physically and forcefully pushed away by the police.

250.   Upon information and belief Ramarley was conscience and suffering between the time he was shot and the time he was pronounced dead.

251.   The time of Ramarley's death is listed at 3:53 p.m., or 52 minutes after he was shot.

252.   Upon information and belief the decedent suffered conscience pain and suffering prior to his death.

253.   That by reason of the aforesaid, the plaintiff, Constance Malcolm, as administratrix of the Estate of Ramarly Graham demands judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.


**AS AND FOR A THIRD THROUGH FIFTH CAUSE OF ACTION ON BEHALF OF CONSTANCE MALCOLM, AS ADMINISTRATRIX OF THE ESTATE OF RAMARLEY GRAHAM,  CONSTANCE GRAHAM INDIVIDUALLY, AND FRANCLOT GRAHAM INDIVIDUALLY AGAINST POLICE OFFICERS HASTE, MORRIS, HORNE, JARVIS, JANE DOE, AND OTHER POLICE OFFICER JOHN DOES, INDIVIDUALLY AND AS POLICE OFFICERS UNDER 42 USCA 1983, 1985**

254.    The plaintiffs repeat and realleges each and every allegation set forth above numbered "1"

through "253" inclusive with the same force and effect as if more fully set forth at length herein.

255.    That on February 2, 2012, the defendants, acting under color of State law, violated the

Federal and State civil and constitutional rights of the decedent, Ramarley Graham, in that they:

    a. deprived the decedent of life and liberty without due process of law

    b. entered the decedent's home without an arrest or search warrant

    c. entered the decedent's home without probable cause

    d. entered the decedent's home without exigent circumstances.

    e. assaulted and battered the decedent

    f. used excessive and deadly force against the decedent

    g. conspired to cover-up the shooting of the decedent

    h. illegally seized the decedent

    i. racially profiled the decedent

    j. profiled decedent based on age and gender

    k. deprived the decedent of the right to be free from the intentional use of unreasonable

    force

    l. deprived the decedent of the right to be free from the intentional use of excessive force

    m. deprived the decedent of the right to be free from unreasonable search and seizure

    n. violated the decedent right to privacy

256.    The defendants, including the named defendant police officers, at all relevant times

hereunder acted within their authority as law enforcement officers within the employ of the

defendants, "City" and "NYPD".

257.    The defendants conspired with one another to deprive Ramarley Graham of his constitutional rights: to be free from the intentional use of force: to be free from unreasonable search and seizure, to be free from serious physical injury, to be free from discrimination, and to be secure in his person and free from unreasonable and excessive force.

258.    The defendants further violated the civil rights of the decedent by conspiring to cover up the facts and circumstances of the shooting.

259.    The defendants' actions are not privileged or immune.

260.    That said acts or actions resulted in unlawfully attempting to stop Ramarley Graham, the unauthorized and unlawful entry into Ramarley Graham's home, a 4th Amendment seizure of Ramarley Graham, shooting Ramarley Graham, and causing him conscience pain and suffering, resulting in his death.

261.    That by reason of his death, Ramarley, as well as his surviving parents, Constance Malcolm and Franclot Graham, sustained a loss of enjoyment of life, including but not limited to loss of love, support, nurture, care, services, affection and companionship.

262.    That by reason of the aforesaid, the plaintiff, Constance Malcolm, as administratrix of the Estate of Ramarley Graham as and for a Third Cause of Action, Constance Malcolm individually as and for a Fourth Cause of Action, and Franclot Graham individually as and for a Fifth Cause of Action, demand judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.

263.    The plaintiffs seeks damages as well as attorneys fees, costs and punitive damages pursuant to 42 USCA 1983,1988.

**AS AND FOR A SIXTH, SEVENTH AND EIGHTH CAUSE OF ACTION ON BEHALF OF CONSTANCE MALCOLM, AS ADMINISTRATRIX OF THE ESTATE OF RAMARLEY GRAHAM, PATRICIA HARTLEY, AND CHINNOR CAMPBELL, BY HIS MOTHER AND NATURAL GUARDIAN CONSTANCE MALCOLM AGAINST THE CITY, KELLY AND DEENTREMONT, FOR SUPERVISORY LIABILITY UNDER 42 USCA 1983**

264.    The plaintiffs repeat and realleges each and every allegation set forth above numbered "1" through "263" inclusive with the same force and effect as if more fully set forth at length herein.

265.    Upon information and belief Kelly was, at all relevant times hereunder, in charge of the New York City Police Department and responsible for hiring, testing, psychological testing and analysis, training, instruction, supervision, assignment, promotion, discipline and oversight of its officers, including Haste, Morris, Horne and Jarvis, Jane Doe, and various Does named herein.

266.    Upon information and belief DeEntremont was, at all relevant times hereunder, was the Deputy Inspector and in charge of the 47th pct., including the Street Narcotic Enforcement Unit. He was responsible for the training, instruction, supervision, assignment, testing, promotion, discipline and oversight of all officers at his command, including defendants Haste, Morris, Horne, Jarvis, Jane Doe and various other Does named herein in their ficiticious capacities as their identities are presently unknown.

267.    Upon information and belief Haste was an Auxillary Police Officer prior to his hire with the NYPD. Upon information and belief, the NYPD failed to obtain or review Haste's complete employment files from his employment as an Auxillary Police Officer, including but not limited to reviews, complaints, background and testing.

268.    Upon information and belief Haste failed his psychological testing exam to become a New York City Police Officer, but nevertheless was hired or promoted to be a police officer.

269.    Upon information and belief the City and/or Kelly was aware that the system of background checks, and psychological testing and analysis of new recruits was inadequate, and often resulted in the hire of psychologically unqualified recruits, yet they acted with deliberate indifference to the need to revamp the system, and provide a more complete and thorough vetting system for new recruits, and continued monitoring, testing, and counseling while in service.

270.    Upon information and belief, the City and/or Kelly knew that the current system would result in the hiring of unqualified persons of questionable psychological makeup, often resulting in their participation in false arrests, discourtesy, excessive use of force, illegal search and seizure, warrantless entry into homes, and other acts of constitutional violations. Yet the City, DeEntremont, and/or Kelly acted with deliberate indifference to this knowledge and to the need to monitor and closely scrutinize and monitor these officers, including but not limited to retesting these officers.

271.    Upon information and belief the City and/or Kelly knew, or should have known, that Haste was psychologically and/or emotionally unqualified to act as a police officer, or to be assigned to the SNEU unit on February 2, 2012. Their deliberate indifference to the knowledge caused, or contributed to the events of February 2, 2012 as set forth herein.

272.    Further, upon information and belief, Haste did not receive all required Street Narcotics Enforcement Unit training before he was placed in the field as part of the SNEU team.

273.    Upon information and belief DeEntremont of the 47th pct. was aware that Haste did not receive the required SNEU training, yet he allowed him to participate in field operations as part of the SNEU team.

274.    Upon information and belief Jarvis, Jane Doe and/or Horne not receive all required training

before they were placed in the field as part of the SNEU team. Upon information and belief DeEntremont of the 47th pct. was aware that Horne, Jane Doe and Jarvis did not receive the required training yet allowed them to participate in field operations as part of the SNEU team.

275.    Upon information and belief, the City, Kelly and DeEntremont routinely did not enforce the requirement of completion of SNEU training before Haste, Horne, Jarvis, Jane Doe and others were permitted to participate in SNEU team field operations.

276.    Upon information and belief the City, Kelly and/or DeEntremont had improperly defined criteria for police officers applying to, and being accepted to, or remaining in the Street Level Narcotics Teams, or SNEU units.

277.    Upon information and belief, once accepted into a SNEU team, it was often customary that the officers will receive their required training while in the unit, which could take months, and did not receive their complete SNEU training prior to their field deployment within the unit. As a result numerous officers assigned to SNEU have not completed their required training, yet were engaged in SNEU operations, including the defendant police officers on February 2, 2012. Upon information and belief the defendant officers were operating outside SNEU guidelines on February 2, 2012, in that they were in violation of Administrative Guide 316-36 which required:

     a.    the attendance in a training course given by Patrol Bureau Services

     b.    at least 7 uniformed members, including one supervisor who completed the training

     c.    the presence of a precinct supervisor with them in the field

     d.    officers who were not part of the observation team, to be dressed in regulation uniform

     e.    SNEU teams were limited to enforcement of street violations only

278.    Upon information and belief, on or prior to February 2, 2012, the defendants, City, DeEntremont, and/or Kelly failed to, and acted with deliberate indifference to the need to, establish and control or system to measure whether police officer, including SNEU officers, received their training, mastered the training, were familiar with the guidelines, received proper supervision, and were prepared to meet all potential situations that may unfold in the field as SNEU officers, including but not limited stops, stop and frisks, exigent circumstances, use of force, calling for back up, establishing a perimeter, probable cause, and use of deadly force.

279.    Upon information and belief the defendants were, prior to February 2, 2012, aware of numerous complaints related to SNEU team members, including those of the 47th pct., relating to illegal search and seizure, excessive use of force, and violations of civil and constitutional rights, which should have been, but was not, addressed and corrected with proper training, oversight, discipline, investigation, monitoring, reassignment, and guideline modification.

280.    The New York City Civil Liberties Union analyzed the policing policies of the New York City Police Department for the years 1994-2006. Their report, titled Mission Failure: Civilian Review of Policing in New York City 1994-2006 by Robert Perry highlights the numerous deficiencies in police training, oversight and discipline. These deficiencies, we submit, are, and were, to numerous and critical to ignore. Yet the City and/or Kelly did just that. Among the issues raised in this report, which upon information and belief the City and/or Kelly had knowledge of, were:

        a.      in 2005, 8 out of every 10 complaints filed with the Civilian Complaint Review Board were made by a minority, with blacks comprising over 50% of all complaints

        b.      Complaints filed with the Civilian Complaint Review Board increased 65% from

2000 to 2005, with 2006 rising another 13%

      c.     the number of excessive force complaints rose 26.8 percent in 2006

      d.    "the most frequently filed allegations involve serious abuse of authority-improper stop, frisk and search; unauthorized entry or search of premises; threat of arrest; threat of force=police actions that could provoke a confrontation between a police officer and a civilian" page 4.

      e.    The NYPD takes no disciplinary action against almost 30% of police officers named in substantiated CCRB complaints. And when discipline was imposed, most officer received just a slap on the wrist, i.e. instructions regarding misconduct (534 cases of the 1607 officers who were "disciplined" 717 officers received a command discipline , which may involve nothing more than a verbal admonishment, or loss of vacation days, In 2006 "instructions" comprised 72% of all disciplinary actions.

      f.    citing the New York City Commission on Police Corruption reports 2002 and 2004, it found that even when the NYPD does prosecute officers for substantiated CCRB complaints, it does so with little zeal and less preparation. Complainants and witnesses are not contacted, documentary evidence is not requested, and the prosecutors skills fail to meet minimum standards of professionalism.

      g.    The police department is far less likely to impose discipline when a substantiated complaint involves a police officer's use of excessive force (page 25)

281.   The NYCLU report concluded that the City has failed to establish meaningful accountability for police misconduct.

282.   The NYCLU report also cited the New York City Public Advocate's report in 2000:

Disciplining Police: Solving the Problem of Police Misconduct, 7/7/00, wherein the report concluded that a police officer's use of force "was no impediment to advancement within the NYPD". Said report contains numerous examples where officers with substantiated complaints of excessive force had received promotions.

283.    Thus, police officers knew that their conduct would engender token scrutiny if a civilian complaint was made. They further knew, and acted with the knowledge on February 2, 2012, that there was little chance of any meaningful discipline even if a complaint was substantiated. Consequently, upon information and belief, Police Officers felt that they were free to engage in stops and frisks without reasonable suspicion, to engage in a warrantless entry into citizens home without probable cause, to use force when it was not required or justified, to use excessive force, to intimidate witnesses to police misconduct, to engage in a conspiracy or "blue wall of silence", to file false reports or give false statements, and to use such catch all phrases such as "furtive movements", or "displayed what appeared to be a gun", to justify their unconstitutional conduct, because said conduct was tolerated by their supervisors, Kelly, and/or DeEntremont.

284.    Defendants City, Kelly and/or DeEntremont, knew, or should have known with the exercise of due diligence, that the improper acts, conduct and procedure, as stated in this complaint, engaged in by Haste, Morris, Jane Doe, Horne, Jarvis and other unknown officers, on February 2, 2012 was likely to occur.

285.    It is submitted that had the defendants, as supervisors, taken the proper remedial measures to guard against the disparate treatment of minority citizens, to guard against racial bias, gender bias, age bias, to adequately and properly train officers in the laws of probable cause, use of force, use of deadly force, search and seizure law, exigent circumstances, the requirements of arrest and

search warrants, to provide in field simulations, to establish proper and effective protocol to review police actions or omissions, and to test and determine each officers knowledge of and compliance with New York Police Patrol Guidelines, Street Narcotics Enforcement Unit Guidelines, and Administrative Guidelines, to make sure the officers assigned to SNEU were properly dressed, supervised and numbered, the constitutional violations and injuries which occurred on February 2, 2012 would not have happened.

286.    The hiring and subsequent assignment of Haste by the City, NYPD and/or Kelly, and the failure of the City, Kelly, and/or DeEntremont to supervise, discipline and complete the training of Haste, Morris, Jarvis, Horne, Jane Doe and the other members of the SNEU team on February 2, 2012, amounted to gross negligence or deliberate indifference, causing the violations of Ramarley Graham's, Patricia Hartley's and Chinnor Campbell's constitutional rights as stated within this complaint.

287.    That by reason of the aforesaid, the plaintiff, Constance Malcolm, as administratrix of the Estate of Ramarley Graham, as and for a Sixth Cause of Action demands judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.

288.    That by reason of the aforesaid, the plaintiff, Patricia Hartley, as and for a Seventh Cause of Action demands judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.

289.    That by reason of the aforesaid, the plaintiff, Constance Malcolm, as mother and natural guardian of Chinnor Campbell, a minor, as and for an Eighth Cause of Action demands judgment against the defendants in a sum exceeding the jurisdictional limits of all the lower courts.

290.    The plaintiffs seek damages as well as attorneys fees, costs and punitive damages pursuant

to 42 USCA 1983, 1988.

**AS AND FOR A NINTH THROUGH TWELFTH CAUSES OF ACTION ON BEHALF OF CONSTANCE MALCOLM, AS ADMINISTRATRIX OF THE ESTATE OF RAMARLEY GRAHAM, PATRICIA HARTLEY, AND CHINNOR CAMPBELL BY HIS MOTHER AND NATURAL GUARDIAN CONSTANCE MALCOLM, AND CONSTANCE MALCOLM INDIVIDUALLY, AGAINST THE CITY AND KELLY FOR MONELL LIABILITY UNDER 42 USCA 1983**

291.   The plaintiffs, Estate or Ramarley Graham by Constance Malcolm, administratrix

( NINTH cause of action), Patricia Hartley ( TENTH cause of action), and Chinnor Campbell, by

his mother and natural guardian Constance Malcolm (ELEVENTH cause of action), and

Constance Malcolm, individually, (TWELFTH cause of action) repeat and realleges each and

every allegation set forth above numbered "1" through "290" inclusive with the same force and

effect as if more fully set forth at length herein.

292.   The plaintiffs allege that the defendants, City and/or Kelly, had customs, practices or

policies in place on February 2, 2012 that included:

     a.    a stop and frisk policy that encouraged officers to stop citizens of the City of New

York on less than reasonable suspicion.

     b.    racially profiling minority citizens for stop and frisk purposes

     c.    engaging in stopping and frisking based on age and gender

     d.    stopping and frisking to meet arrest quotas

     e.    stopping and frisking to meet summons quotas

     f.    permitting the use of force within stop and frisk encounters, although the encounter

does not result in an arrest or summons

     g.    using excessive force during stop and frisk

g.      disparate application of stop and frisk guidelines, policies and procedures based upon race, gender and age.

h.      enforcement and targeting the stop and frisk policy in predominately minority communities.

i.      failing to adequately analyze the reasons of reported stop, reported frisk, use of force

j.      condoning a code of silence to cover-up police misconduct

k.      condoning witness intimidation to cover-up police misconduct

l       failing to discipline officers who provide false or misleading information, or file false reports

293.    Upon information and, the latter customs, i.e. condoning codes of silence, witness intimidation/retaliation and failing to discipline officers had caused police officers to provide false and misleading information if and when police investigations are in fact conducted. Upon information and belief a "blue wall of silence" has been ingrained in NYPD police culture for years.

294.    In 1994 the Mollen Commission found that police perjury is the most pervasive form of police misconduct. In 1996 the Police Commissioner Howard Safir issued an Order that warned that officers who provide false information in the course of police misconduct investigation would be terminated.. Yet, the aforementioned NYCLU report finds that the Order was rarely enforced.

295.    The NYCLU report further states "when a civilian objects to a police officer's conduct, or expresses an intention to file a complaint against the police officer, a retaliatory arrest or summons may follow. This, they claim, is a common occurrence, and did in fact occur on February 2, 2012.

296.   Patricia Hartley witnessed her grandson shot on February 2, 2012. Her objections to the police conduct were met with a physical assault and battery, threats, imprisonment against her will, isolation, intimidation and mental cruelty.

297.   The plaintiffs also allege that on or before February 2, 2012, the City and/or Kelly acted with deliberate indifference to the following acts, actions, omissions, customs and practices of its officers, including the defendant officers herein, which include:

    a.    stopping citizens of the City of New York on less than probable cause.

    b.    racially profiling minority citizens for stop and frisk purposes

    c.    engaging in stopping and frisking citizens based on the subjects race, age and/or gender

    d.    stopping and frisking citizens to meet arrest quotas

    e.    stopping and frisking to meet summons quotas

    f.    searching citizens on less than probable cause or reasonable suspicion

    g.    the use of force within stop and frisk encounters, although the encounter does not result in an arrest or summons, and/or justify the need to use force

    h.    disparate application of stop and frisk guidelines, policies and procedures based upon race, gender and age.

    i.    targeting the stop and frisk policy in predominately minority communities.

    j.    using excessive and unnecessary force

    k.    failing to report the use of excessive and unnecessary force

    l.    engaging in a conspiracy to cover-up unlawful conduct

    m    illegal search and seizure

n.   promoting or assigning officers with incomplete training

o.   violations of citizens 4th and 14th amendment rights

p.   witness intimidation

q.   illegal accessing sealed information

r.   discharging weapons in the presence of "innocent civilians"

s.   illegal entry into citizens' homes

t.   promoting officers who have a history of complaints made against them

u.   permitting officers to break assignment without proper training.

v.   denying witnesses to police shootings access to counsel

298.   Issues of racial profiling, stop and frisk policy and the need for supervision and monitoring have long plagued the New York City Police Department. In Daniels et. al. v. City of New York et al, 99 Civ 1695 Southern District New York, the defendants, including the City were required via Stipulation and Settlement to have a written policy regarding racial or ethnic/national origin profiling that complies with the Constitutions of the United States and the State of New York. The NYPD was required to supervise, train (including annual in-service training) and monitor officers regarding this Racial Profiling Policy. Upon information and belief the defendants have failed to comply with these requirements, and/or have not continued their application past the expiration of the mandates of the Stipulation.

299.   The Daniels settlement also required all NYPD officers to fill out stop, question and frisk activity, and to audit all records to insure that the activity is based on reasonable suspicion. Upon information and belief the defendants have failed to comply with these requirements

300.   As part of the Daniels settlement, the City was required to train its police officers: in the

legal and factual basis for conducting and documenting stop, question and frisk activity; in cultural diversity, and integrity and ethics, including departmental policies regarding false statements, reporting misconduct by other officers, and cooperating in department investigations. Upon information and belief the NYPD has failed to comply with these requirements as well.

301.    As per Operations Order Number 11, issued March 13, 2002 governing Racial Profiling, Commanding Officers, (such as defendant DeEntremont) are required to ensure that the contents of the policy are "brought to the attention" of members of their command. Upon information and belief the NYPD did not define what "brought to the attention" meant, or how said information was to be delivered. Further, by emphasizing the basic requirement to deliver the message or policy, rather than ensuring that the policy was understood and applied by those officers who received it, they acted with deliberate indifference to the knowledge that said policy was not being applied in a manner that met constitutional muster.

302.    The plaintiffs allege that the City and /or Kelly acted with further deliberate indifference to the need to critically analyze psychological data and a recruits background,   the need to report and record all psychological referrals and place said reports on the officer's personnel files; the need to modify and provide more effective training, testing, grading, and if necessary require retesting and field supervision, the need to provide proper legal advice and adequate academy supervision, provide in service or in-field supervision, the need to adequately and zealously discipline non-complaint officers and precincts, the need to investigate, monitor, and analyze police officers and precinct data, and the need reassign non-compliant officers or command officers, if necessary.

303.    That said deliberate indifference to the need to:

a. train officers in search and seizure laws, stop and inquire, probable cause, use of force, and use of deadly force,

b. to grade and test to see if officers mastered legal and tactical concepts

c. to ensure that each officer reads and understands legal bulletins provided

d. to provide officers with situational training for use of weapons

e. train officers to use methods to avoid the need to use deadly force

f. analyze police shootings to determine if officer's actions prior to the shooting contributed to need to use deadly force

g. properly discipline officers who fail to follow police and administrative guidelines,

h. discipline officers whose actions escalate the need to use force or deadly force

i. analyze disparities of application of stop, frisks, and use of force as applied   between whites and minorities,

j. track, discipline, monitor, retrain and reassign officers who have questionable stop and frisk practices, use of force complaints, complaints of witness intimidation, providing false statements, among other violations, as reported by number of citizen complaints, notices of claim, lawsuits and/or dismissals of their arrests and summons and complaints of fellow officers,

k. to retest officers knowledge of patrol guidelines when they are out of the academy

l. to provide situational simulations and to grade the officers performance, and not pass the officer until he or she has demonstrated adequate proficiency

m. to require officers to call for specialized units before engaging in a forcible warrantless entry into a citizen's home

n. to discipline officers who fail to report non-compliant officers or who engage in a conspiracy of silence; and

o. to determine if police or law enforcement personnel are illegally accessing sealed information,

p. report all referrals for psychological counseling, and change the officers assignment if required or necessary.

caused or substantially contributed to the events of February 2, 2012, which include the illegal entry into Ramarley's, Patsy's and Chinnor's home, forcible entry into their home, the use of excessive force, the use of deadly force, the subsequent police cover-up, including the illegal access of sealed information, the firing a weapon in the presence of Patricia Hartley and Chinnor Campbell while they were in the zone of danger, seizing and intimidating Patricia Hartley, threatening Patricia Hartley, assaulting and battering Patricia Hartley, falsely imprisoning Patricia Hartley, inflicting emotional distress on Patricia Hartley, assaulting and battering Constance Malcolm, and inflicting emotional distress on Chinnor Campbell and Constance Malcolm.

304 .   The City and/or Kelly were aware that the NYPD customs, policies and procedures, as well as their deliberate indifference to the unconstitutional applications of their customs, policies and procedures, and need for reformation of its training, oversight, analysis, supervision, monitoring, disciplining and review would lead to constitutional violations of its citizenry, and did lead to said violations of the plaintiffs constitutional rights on February 2, 2012.

a. In the case of Ligon v. City of New York, Raymond W. Kelly et al. Justice Scheindlin's Opinion and Order filed 1/8/13, noted that the police training in laws of search and seizure are wrong. She sites as an example of inadequate training a Police Training Video (no. 5) which she

stated incorrectly advised police officers what constituted  a  "stop",  and whether force, or the threat of force mst accompany the police action to constitute a "stop".

    b.  In Ligon, Justice Scheindlin found fault in the police training video which made incorrect distinctions between "stops' and "arrests". In her decision she writes "By incorrectly implying that the encounters lacking the characteristics of a *arrest* are in fact not even *stops,* the video appears to train officers that they do not need reasonable suspicion to perform the kinds of stops that an accurate reading of the law would be classified as Terry stops. In other words, this video, …….trains officers that it is acceptable to perform stops…. or possibly even arrests, without reasonable suspicion", pages 126,127

    c.  Justice Scheindlin further found that "the evidence of numerous unlawful stops at the hearing strengthens the conclusion that the NYPD's inaccurate training has taught officers the following lessons: stop and question first, develop reasonable suspicion later" Ligon at 131

305.    Upon information and belief the police lacked reasonable suspicion to stop Ramarley Graham, or to "continue to chase" him at gun point, if, as they maintain, (which the plaintiffs deny), he "ran" from them. At no time, however, did the police have probable cause to believe that Ramarley Graham had committed a felony and that exigent circumstances existed that would justify their forcible entry into his home absent a warrant issued by a Judge.

306.    The defendants' deliberate indifference is further evident by and through the lack of meaningful investigation and punishment of transgressors. Upon information and belief the NYPD Internal Affairs Bureau, "IAB", investigations rarely lead to administrative trials, and when they do, and the charges are somehow sustained, the punishment is minimal, thereby lacking any deterrent effect.

307.    Upon information and belief officers operated with the tacit approval of their supervisors and up the ranks, with an "ends justify the means" mentality. This mentality includes a custom or practice of stopping, or stopping and frisking first, then establishing reasonable suspicion after the fact. Use of force was viewed as collateral damage of the stop and frisk policy established by the NYPD.

308.    Police Officers were rarely, if ever brought up on charges, investigated or disciplined for their overaggressive application of stop and frisk policies and practices, including pursuits into homes, use of force, or discharge of their weapons.

309.    Precinct commanders and supervisors were rarely, if ever, investigated, disciplined, reassigned or retrained due to their own observations of misconduct, review of data or complaints from citizens for excessive use of force, 4th Amendment violations, illegal search and seizure, illegal entry into citizen's homes without a warrant, false arrests, witness intimidation, submitting false police reports, and other constitutional rights violations occurring in their Command, under their watch. In fact Procedural Guide for Police Supervisors (for the NYPD) sets forth certain protections for police officers and restrictions placed on supervisors, all at the expense of the general public. They include:

    a.    PG 205-46 which states that records of officers who engage in counseling services will not be duplicated or forwarded anywhere within the NYPD.

    b.    If a supervisor officially refers a member of service for counseling, in non disciplinary cases, No report will be generated, no record of the referral will be noted in the member's personnel file, and Supervisors will only be advised as to the level of cooperation of the officer on a need to know basis. (PG 205-46)

     c.     Officers who participate in counseling services will not jeopardize their assignments. Assignments will not be changed…. Unless a change is deemed appropriate for all parties.

310.    Thus, the City acted with deliberate indifference to the need to reform their customs and practices which included as stated herein rampant examples of constitutional violations of its citizenry, thereby lending tacit approval to the unconstitutional conduct. Upon information and belief, the City, Kelly and/or the named defendants herein, were more interested in meeting 'numbers', than they were safeguarding the constitutional rights of its citizens.

311.    Other instances of: racial bias or profiling; an illegal and/or improper stop and frisk program, custom, practices or policy; the application of and tolerance of excessive use of force; police cover-ups which include filing false charges and intimidating witnesses to said misconduct; and warrantless entry into citizens homes are:

     a.     On November 11, 2007 at 3 a.m. Antoine Parsley, an African American male, was walking in the vicinity of 123rd Street and 2nd Avenue in New York, when he observed Officers from the 25th precinct chasing two unknown individuals. One of the Officers came up to Parsley and grabbed him, punched him in the mouth, and handcuffed him while being surrounded by other Officers. Parsley was never informed as to why he was being arrested and when he inquired he was told to "shut the fuck up." Parsley was transported to the precinct, searched, and stripped of all his belongings. When Parsley's cousin came into the precinct to check on him, he too was arrested and put in the same holding cell. Officers later came into the holding cell, held Parsley down on a bench, and punched him repeatedly. They proceeded to choke him while he was handcuffed to the bench. Parsley was falsely charged with obstruction of governmental administration, which was